[No. F051843. Fifth Dist. Nov. 24, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
GERARDO ZAVALA, Defendant and Appellant.

**COUNSEL**

Linda M. Leavitt, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Stephen G. Herndon and Paul E. O'Connor, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**GOMES, J.**—Eric Jones was punched, knocked out, and tied by his hands and feet, and he was beaten beyond recognition, stripped of his clothing, and shocked with electricity, and he was sodomized with a tool handle, put into the trunk of a car, and driven to a remote area, and he was dragged into a field and shot 10 times at close range, and he bled to death. Gerardo Zavala admitted to a detective his involvement in some, but not all, of the acts of abuse. After two jury trials led to an acquittal on one charge and mistrials on all other charges, a third jury found him guilty of second degree murder, torture, and kidnapping and found two firearm allegations true. The trial court sentenced him to 18 years to life. We will affirm the judgment.

## PROCEDURAL HISTORY

On February 8, 2006, a second amended information charged Zavala with, inter alia, first degree murder (count 1), torture (count 2), and kidnapping (count 3).[1] (Pen. Code, §§ 187, subd. (a), 206, 207, subd. (a), 289, subd. (a), 12022, subd. (a)(1), (2).)[2] On October 24, 2006, a jury found him not guilty of first degree murder, found him guilty of the lesser included offense of second degree murder (count 1), guilty of torture (count 2), and guilty of kidnapping (count 3) and in all three counts found true the allegations that a principal was armed with an assault rifle and that a principal was armed with a nine-millimeter handgun but found not true the allegation that a principal was armed with a .25-caliber handgun.

On November 21, 2006, the trial court sentenced Zavala to an aggregate term of 18 years to life. His sentence on count 1 was 15 years to life for second degree murder plus three years consecutively for arming of a principal with an assault rifle plus one year stayed for arming of a principal with a

---

[1] The discussion (*post*, pt. 1) will set out additional procedural history.

[2] Later statutory citations are to the Penal Code except where otherwise noted.

firearm other than an assault rifle. His stayed sentence on count 2 was life with possibility of parole for torture plus three years consecutively for the arming of a principal with an assault rifle plus one year for the arming of a principal with a firearm other than an assault rifle. His stayed sentence on count 3 was eight years (the aggravated term) for kidnapping plus three years consecutively for the arming of a principal with an assault rifle plus one year for the arming of a principal with a firearm other than an assault rifle. (§§ 190, subd. (a), 206.1, 208, 654, 1170.1, subd. (f), 12022, subd. (a)(1), (2).)

## FACTUAL HISTORY

On January 28, 2001, just days after Jones's murder, Gerardo Zavala told a detective about the final hours of Jones's life. Zavala drove Tyrone Ebaniz and Gerardo Soto to pick Jones up and drive him to a garage where Zavala punched and knocked him out and held him down while Ebaniz and Soto tied him up. Right after Keith Seriales and Jorge Vidal showed up, Vidal jumped on Jones, slammed his head onto the cement floor, and hit him in the face with a pipe. His face was no longer recognizable.

Seriales got some duct tape. Zavala went into the house and back to the garage, where he saw Seriales and Vidal tying up Jones with duct tape and saw Ebaniz, Seriales, and Vidal kicking "a stick in his butt." He heard Vidal "laughing and saying 'look, look what we did to him' " and heard Jones yelling in pain. Jones was "electrified" later.

Vidal "wanted him to . . . suffer some more" so he told someone to pull the duct tape off Jones's nose and mouth. "That's why he didn't want him dying right away." After Zavala went into the house again and then came outside, he saw Jones in the trunk of Seriales's car. As Vidal was about to shut the trunk, Zavala told him Jones's knees were "too high." Vidal said, "Where he's going uh . . . he's not gonna worry about his knees."

After Zavala used his car and someone else's jumper cables to start Seriales's car, Seriales drove him (in the front seat), Ebaniz (in the backseat), and Jones (in the trunk) to a remote spot on a paved road. Soto, Vidal, and someone else followed in another car. With a cocked nine-millimeter gun in his hand, Vidal said, "Hurry up," as Zavala tried to get Jones out of the trunk, but Jones slipped out of his grasp and hit the pavement. Seriales dragged him just off the road into a field, where Vidal shot him again and again as he lay on the ground bound and naked.

## ISSUES ON APPEAL

Zavala raises three issues on appeal. First, he argues that the doctrine of collateral estoppel requires reversal of the torture count. Second, he argues

that the admission of certain hearsay statements as adoptive admissions violated both the hearsay rule and the confrontation clause and that his attorney rendered ineffective assistance of counsel if the absence of a constitutional objection forfeited his right to appellate review. Third, he argues that CALCRIM No. 220 impermissibly precluded the jury from considering lack of evidence on the issue of proof beyond a reasonable doubt.

## DISCUSSION

### 1. *Collateral Estoppel*

Zavala argues that the doctrine of collateral estoppel requires reversal of the torture count. The Attorney General argues the contrary.

The second amended information led to all three of Zavala's jury trials, but some of the charges and allegations before his first and second juries were not before his third jury—specifically, four special circumstance allegations (murder by torture, murder by lying in wait, murder during kidnapping, and murder during sexual penetration by foreign object) and two sex crime charges (sexual penetration by foreign object and sexual penetration by foreign object in concert) with, as to each, two sex crime allegations (kidnap and torture). (§§ 190.2, subd. (a)(15), (17)(B), (17)(K), (18), 264.1, 289, subd. (a), 667.61, subds. (a), (c)(5), (d)(2), (3).) At his first trial, the jury found him not guilty of sexual penetration by foreign object and hung on the other counts, and the trial court declared a mistrial on February 15, 2006. At his second trial, the jury hung on all counts, and the trial court declared a mistrial on May 10, 2006.

On September 1, 2006, Zavala filed a motion to dismiss the sexual penetration by foreign object in concert count due to his acquittal on the sexual penetration by foreign object count. On September 21, 2006, the trial court granted his motion.

On October 3, 2006, Zavala made a motion in limine to keep from his third jury evidence about the tool handle since his first jury had acquitted him of the sexual penetration by foreign object count. The prosecutor argued that since Jones "screamed in pain" as Zavala helped to move him while the handle was still inside his rectum there was no way to divorce the conduct in that count from the conduct in the torture count. The trial court denied the motion.

The rule of collateral estoppel—"embodied" in the double jeopardy clause and "extremely important" to the criminal justice system—requires "that when an issue of ultimate fact has once been determined by a valid and

final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." (*Ashe v. Swenson* (1970) 397 U.S. 436, 443, 445 [25 L.Ed.2d 469, 90 S.Ct. 1189] (*Ashe*).) The application of the rule requires not the "hypertechnical and archaic approach of a 19th century pleading book" but the approach of "realism and rationality." (*Id.* at p. 444.) "Where a previous judgment of acquittal was based upon a general verdict, as is usually the case, this approach requires a court to 'examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration.' " (*Id.* at p. 444, fn. omitted.)

In *Ashe*, a group of armed and masked men robbed each person in a group of poker players. (*Ashe, supra*, 397 U.S. at pp. 437–438.) At the defendant's first trial, a jury acquitted him of robbing one poker player, but at his second trial a jury convicted him of robbing another poker player. (*Id.* at pp. 439–440.) Since the sole issue in dispute at his first trial was his identity as one of the robbers, the high court held that the rule of collateral estoppel answered in the negative the question whether the prosecution "could constitutionally hale him before a new jury to litigate that issue again." (*Id.* at pp. 445–447.)

In a later case that distinguished *Ashe*, a man acquitted of burglary, attempted robbery, assault, and weapons charges sought to exclude from his later bank robbery trial the testimony of an eyewitness in his earlier trial identifying one intruder and describing the other intruder's mask and gun. (*Dowling v. United States* (1990) 493 U.S. 342, 344–345 [107 L.Ed.2d 708, 110 S.Ct. 668] (*Dowling*).) The bank robbery prosecutor sought to admit the eyewitness testimony to show not only the similarity of the mask and the gun in the two offenses but also the identification of the man the police saw in the ostensible getaway car in front of the bank shortly before the robbery as the other intruder. (*Id.* at p. 345.) Noting that "the prior acquittal did not determine an ultimate issue" in the bank robbery trial, the high court declined to extend the holding in *Ashe* to prohibit "relevant and probative evidence that is otherwise admissible . . . simply because it relates to alleged criminal conduct for which a defendant has been acquitted." (*Id.* at p. 348.)

Assuming arguendo that the acquittal established reasonable doubt that the defendant was the masked intruder, the high court emphasized that at the bank robbery trial the prosecutor had no duty to prove that fact beyond a reasonable doubt and the jury could reasonably conclude that the defendant was the masked intruder without believing beyond a reasonable doubt that he committed the burglary. (*Dowling, supra*, 493 U.S. at pp. 348–349.) So the rule of collateral estoppel was inapplicable. (*Id.* at p. 349.)

■ Here, Zavala's first jury acquitted him of sexual penetration by foreign object, but that does not mean either that Jones did not suffer a sexual penetration by foreign object or that Zavala was not guilty of torture. His third jury could have found him guilty of torture for punching and knocking Jones out to immobilize him for others to beat him beyond recognition and for helping to move Jones as he screamed in pain with the handle still inside his rectum even though others, not he, inserted and kicked the handle. As a rational jury at his first trial could have grounded his acquittal on the sexual penetration by foreign object count on an issue other than the evidence he now "seeks to foreclose from consideration," and as that acquittal did not determine the "ultimate issue" at his third trial of whether he was guilty of torture, the collateral estoppel rule is inapplicable to the admission of "relevant and probative evidence" that was "otherwise admissible" to show how others, not he, inserted and kicked the handle into Jones's rectum. (*Dowling, supra,* 493 U.S. at pp. 348–349; see *Ashe, supra,* 397 U.S. at pp. 443–444.)

## 2. *Adoptive Admissions*

Zavala argues that the admission of certain hearsay statements as adoptive admissions violated both the hearsay rule and the confrontation clause and that his attorney rendered ineffective assistance of counsel if the absence of a constitutional objection forfeited his right to appellate review. The Attorney General argues that there was neither a hearsay violation nor a confrontation clause violation, that there was no ineffective assistance of counsel, and that error, if any, was harmless.

The statements at issue were uttered by Jose Jimenez, who testified at Zavala's second trial but who could not testify during his third trial due to complications arising out of transit in custody. By stipulation, the prosecutor read Jimenez's prior testimony to the jury. Sometime after Jones's murder Jimenez went to Zavala's house, where Seriales, Soto, Vidal, and Zavala were working on a truck. He was 100 percent sure that he heard Vidal say, "we finally got that [racial epithet]" even though he testified earlier to hearing Seriales say that. He knew that Zavala, whose voice he recognized, did not say that.

Jimenez testified that he heard someone say, "nobody better talk or they are going to get it worse" but he did not remember who. Earlier he testified that he heard not only, "we finally got that [racial epithet]" but also that "he won't be bothering us anymore." Later he testified that he heard Seriales say, "we finally got that [racial epithet]" and heard Vidal respond, "he won't be bothering us anymore." Zavala "was standing there when these people were talking" but neither said anything nor denied anything.

Evidence Code section 1221 codifies the hearsay exception for an adoptive admission: "Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth." The trial court instructed Zavala's jury with CALCRIM No. 357 on how to determine if an out-of-court statement was an adoptive admission:

"If you conclude that someone made a statement outside of court that accused the defendant of the crime or tended to connect the defendant with the commission of the crime and the defendant did not deny it, *you must decide whether each of the following is true*:

"1. The statement was made to the defendant or made in his presence;

"2. The defendant heard and understood the statement;

"3. The defendant would, under all the circumstances, naturally have denied the statement if he thought it was not true;

"AND

"4. The defendant could have denied it but did not.

"If you decide that all of these requirements have been met, you may conclude that the defendant admitted the statement was true.

"If you decide that any of these requirements has not been met, you must not consider either the statement or the defendant's response for any purpose." (Italics added.)

■ Zavala argues that the evidence at issue was inadmissible hearsay, not an adoptive admission. " 'For the adoptive admission to apply . . . a direct accusation in so many words is not essential.' (*People v. Fauber* (1992) 2 Cal.4th 792, 852 [9 Cal.Rptr.2d 24, 831 P.2d 249].) 'To warrant admissibility, it is sufficient that the evidence supports a reasonable inference that an accusatory statement was made under circumstances affording a fair opportunity to deny the accusation; whether defendant's conduct actually constituted an adoptive admission becomes a question for the jury to decide.' (*People v. Edelbacher* (1989) 47 Cal.3d 983, 1011 [254 Cal.Rptr. 586, 766 P.2d 1] [disapproved on another ground by *People v. Lloyd* (2002) 27 Cal.4th 997, 1008, fn. 12 [119 Cal.Rptr.2d 360, 45 P.3d 296]].)" (*People v. Geier* (2007) 41 Cal.4th 555, 590 [61 Cal.Rptr.3d 580, 161 P.3d 104].)

In *Fauber*, a witness testified that the voices of the defendant and two other men awakened her. (*People v. Fauber, supra,* 2 Cal.4th at p. 851.) Feigning sleep, she heard someone talk about having to " 'get rid of his body' " and "get rid of his bicycle" but she could not identify who made those statements. (*Ibid.*) Our Supreme Court rejected the argument that the statements she heard were not adoptive admissions: "For the adoptive admission exception to apply, however, a direct accusation in so many words is not essential." (*Id.* at p. 852.) "The circumstances afforded defendant the opportunity to deny responsibility, to refuse to participate, or otherwise to dissociate himself from the planned activity; he did not do so. Defendant complains that [the witness] did not testify as to whether he actually heard the statements, but we find it entirely reasonable to infer that preliminary fact from her testimony that he participated in the conversation." (*Ibid.*)

Here, Jimenez testified that Zavala "was standing there when these people were talking" but neither said anything nor denied anything. At the instruction settling conference, Zavala opposed giving CALCRIM No. 357 on the ground that the statements to which Jimenez testified were not adoptive admissions. The prosecutor replied that Zavala would not have been "listening to this conversation" if he "wasn't a part of it." The trial court found the evidence at issue "meets the criteria for an adoptive admission. Whether it is believed to be such by the jury is a matter for their determination, and I think the instruction is appropriate." By characterizing the statements at issue as adoptive admissions and by instructing with CALCRIM No. 357, the trial court properly put the evidence before the jury.

■ With reference to Zavala's confrontation clause argument, since adoptive admissions are in effect the defendant's own admissions, no concerns arise about the credibility or veracity of the original declarant, so no violation of the confrontation clause arises from the admission into evidence of the statements at issue. (*People v. Roldan* (2005) 35 Cal.4th 646, 711, fn. 25 [27 Cal.Rptr.3d 360, 110 P.3d 289], citing *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177, 124 S.Ct. 1354].) With reference to his ineffective assistance of counsel argument, since the law neither does nor requires idle acts, Zavala's attorney did not render ineffective assistance of counsel by declining to make a futile confrontation clause objection to the admission of those statements. (See Civ. Code, § 3532; *People v. Anderson* (2001) 25 Cal.4th 543, 587 [106 Cal.Rptr.2d 575, 22 P.3d 347].)

### 3. *CALCRIM No. 220*

Zavala argues that CALCRIM No. 220 impermissibly precluded the jury from considering lack of evidence on the issue of proof beyond a reasonable doubt. The Attorney General argues the contrary.

The fundamental premises of Zavala's argument are the United States Supreme Court's characterization of the basis of reasonable doubt as " ' "reason which arises from the evidence or *lack of evidence*" ' " (*Johnson v. Louisiana* (1972) 406 U.S. 356, 360 [32 L.Ed.2d 152, 92 S.Ct. 1620], italics added) and the California Supreme Court's acknowledgment that reasonable doubt "may well grow out of the *lack of evidence* in the case as well as the evidence adduced" (*People v. Simpson* (1954) 43 Cal.2d 553, 566 [275 P.2d 31], italics added).

On that foundation, Zavala challenges the language in the final paragraph of CALCRIM No. 220 requiring that while deliberating on the issue of proof beyond a reasonable doubt the jury "impartially compare and consider all *the evidence that was received throughout the entire trial.*" (Italics added.) He argues that the use of that language "improperly requires the defendant to persuade the trier of fact of his innocence by evidence presented at trial and eliminates the doctrine of reasonable doubt due to *lack of evidence.*" (Italics added.) He likewise criticizes the definition of evidence in CALCRIM No. 222 as "the sworn testimony of witnesses, the exhibits admitted into evidence, and anything else I told you to consider as evidence" for exacerbating the problem with the language in CALCRIM No. 220.

Zavala acknowledges he "is aware of cases disagreeing with this analysis" but says he "disagrees with those analyses." Yet he cites to, and we are aware of, no case agreeing with his argument, which no fewer than four recent published opinions roundly reject. (*People v. Garelick* (2008) 161 Cal.App.4th 1107, 1117–1119 [74 Cal.Rptr.3d 815]; *People v. Flores* (2007) 153 Cal.App.4th 1088, 1091–1093 [63 Cal.Rptr.3d 694]; *People v. Westbrooks* (2007) 151 Cal.App.4th 1500, 1508–1510 [61 Cal.Rptr.3d 138]; *People v. Hernandez Rios* (2007) 151 Cal.App.4th 1154, 1156–1157 [60 Cal.Rptr.3d 591].) We draw his attention to another recent published opinion rejecting a similarly repetitive challenge to CALCRIM No. 220 and urging the criminal appellate defense bar to focus on "arguably meritorious grounds of appeal." (*People v. Zepeda* (2008) 167 Cal.App.4th 25, 28 [83 Cal.Rptr.3d 793].)

In the interest of judicial efficiency, we adopt as our own, and incorporate by reference, the analyses with which Zepeda disagrees in each of those four recent published opinions and reject his argument for failure to satisfy the standard of review of a reasonable likelihood that the jury applied the instruction in a way that denied fundamental fairness. (See *Estelle v. McGuire* (1991) 502 U.S. 62, 72–73 [116 L.Ed.2d 385, 112 S.Ct. 475]; *People v. Clair* (1992) 2 Cal.4th 629, 663 [7 Cal.Rptr.2d 564, 828 P.2d 705].)

## DISPOSITION

The judgment is affirmed.

Cornell, Acting P. J., and Kane, J., concurred.

Appellant's petition for review by the Supreme Court was denied February 25, 2009, S169450.